UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:11-CV-00181-GNS-LLK

AMERICAN COMMERCIAL LINES LLC, et al.     PLAINTIFFS

v.

EDWARDS ENTERPRISES, LLC
  d/b/a PADUCAH RIGGING,     DEFENDANT/THIRD-PARTY PLAINTIFF

and

SHANDONG HUADING MACHINERY
CO., LTD, et al.     THIRD-PARTY DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment as to Mitigation of Damages (DN 70); Third-Party Defendant Shandong Machinery U.S.A., Inc.'s ("Shandong") Motion for Summary Judgment (DN 73); Defendant Edwards Enterprises, LLC d/b/a Paducah Rigging's ("Paducah Rigging") Motion for Summary Judgment (DN 74); and Third-party Defendant S.M.C. Int'l Inc.'s ("SMC") Motion for Summary Judgment (DN 75). For the reasons discussed below, the Court **DENIES** each motion.

### I.  BACKGROUND

On October 31, 2009, the M/V CINDY CELESTE ("Cindy Celeste"), a towboat operating on the Mississippi river, picked up 15 loaded barges and started to head southbound down the river. (Am. Compl. 2, 4, DN 29). Mate Billy Brown ("Mate Brown") tightened the face rigging when the Cindy Celeste was faced up to the barges. (Ford Dep. 94:19-23, Feb. 27, 2014, DN 72-7). Before his watch ended at 11:00 a.m., Mate Brown tightened the rigging again.

(Brown Dep. 40:21-41:1, 47:21-48:1, Apr. 25, 2014, DN 72-9). The Cindy Celeste proceeded to St. Louis, where Captain Timothy Ford ("Captain Ford") took the Cindy Celeste through the Merchants and McKinley bridges. (Schuster Dep. 39:8-10, July 25, 2014, DN 71-4; Ford Dep. 76:6-8). At around 11:15 or 11:20 a.m., Pilot Calvin Layton ("Pilot Layton") relieved Captain Ford. (Ford Dep. 82:23-83:16). Pilot Layton then cleared the Martin Luther King bridge and the Eads bridge without issue. (Layton Dep. 107:2-108:1, Jan. 23, 2014, DN 72-8).

After clearing the Eads bridge, Pilot Layton slowed the throttles down because he "was lined up right where [he] wanted to be for [the] Poplar Street [bridge]." (Layton Dep. 108:5-14). He did not feel any slack in the face wires at that time. (Layton Dep. 116:23-117:3). Shortly thereafter, Captain Ford felt the Cindy Celeste go "umph," then felt a lunge, and then heard "bam." (Ford Dep. 90:16-24). The face wire on the port side had broken, followed very shortly thereafter by failure of the port wing wire.[1] (Brown Dep. 61:3-62:23).

Realizing he could no longer control the tow, Pilot Layton purposefully broke the wires on the starboard side by maneuvering the boat so the wires were stressed beyond their limits. (Layton Dep. 124:25-126:13). This action was necessary for the safety of the crew, who would otherwise have been in danger when the barges hit the bridge. (Layton Dep. 125:7-16). Set adrift, the barges hit the bridge and two of the barges sank. (Layton Dep. 136:4-9; Ford Dep. 92:22-24). The sunken barges were recovered on or about December 29, 2009 (barge SER-302), and November 13, 2010 (barge ACBL-5015). (Report of Survey 2, DN 70-5). In addition, the remaining released barges caused damage to property along the river, consisting of damages to other barrages, a boat, and a railroad bridge. (*See* ACL Damages Summary 1, 7, DN 70-2).

---

[1] Face wires are fitted with an aluminum sleeve that shapes the wire to form an eye. (*See* Photograph, DN 68-5). The port face wire had "pulled out of that sleeve." (Ford Dep. 102:11-12).

Plaintiffs filed their Complaint in this Court on October 28, 2011, alleging that Paducah Rigging "designed, manufactured, and/or sold" the face wire at issue in its ordinary course of business, and that the face wire was defective in both design and manufacture. (Compl. 6, DN 1). On July 25, 2012, Plaintiffs filed their First Amended Complaint asserting additional claims against Paducah Rigging for failure to warn, two counts of negligence, breach of implied warranty of merchantability, and breach of warranty for a particular purpose. (First Am. Compl., DN 29).

On June 8, 2012, Paducah Rigging filed its Third-Party Complaint against Third-Party Defendants Shandong Huading Machinery Co., Ltd., Shandong Machinery I & E Group Corp., and S.M.C. Int'l, Inc., alleging the third-party defendants designed, manufactured, distributed, sold and/or otherwise placed the defective sleeve into the stream of commerce , and seeking indemnity and/or contribution. (Third-Party Compl. 3-4, DN 18). On July 24, 2012, Paducah Rigging filed its Amended Third-Party Complaint adding Qingdao Changlong Industries Corporation and Shandong Machinery U.S.A., Inc. as additional third-party defendants. (Am. Third-Party Compl., DN 26).

The parties filed all four dispositive motions under consideration on May 15, 2015. Each motion has been fully briefed and is ripe for adjudication.

## II.   JURISDICTION

This Court has jurisdiction of this matter because it arises under admiralty law. *See* 28 U.S.C. § 1333.

## III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue of material fact when "looking to the record as a whole, a reasonable mind could come to only one conclusion . . . ." *Mickler v. Nimishillen & Tuscarawas Ry. Co.*, 13 F.3d 184, 186 (6th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). "When moving for summary judgment the movant has the initial burden of showing the absence of a genuine dispute as to a material fact." *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 520 (6th Cir. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists 'a genuine issue for trial.'" *Id.* (citing *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004)).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). Rather, the non-moving party must present specific facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION

### A. Mitigation of Damages

William Carrier, a marine surveyor, was contacted by Plaintiff American Commercial Lines LLC ("ACL") on or around the date of the Cindy Celeste incident regarding barge

4

removal. (Carrier Dep. 8:2-22, 23:8-13, Sept. 24, 2014, DN 83-2). Carrier selected Okie Moore Diving and Salvage ("Okie Moore") to perform the recovery. (Carrier Dep. 57:2-7, 58:1-6).

The first of the two sunken barges, SER-302, sank adjacent to the right descending channel pier of the MacArthur bridge. (Carrier Marine Report Number: 09-304-01A at 3, DN 168-12 [hereinafter SER-302 Report]). Recovery began on December 10, 2009, and ended on December 20, 2009, at a cost to ACL of $309,000. (SER-302 Report 3-5). The second of the two sunken barges, ACBL-5015, sank "hard against and broken around" the left descending channel pier of the MacArthur bridge. (Carrier Marine Report Number: 10-048-01 at 2, DN 168-16 [hereinafter ACBL-5015 Report]). Recovery began on February 17, 2010, ceased on February 22, 2010, resumed on September 7, 2010, ceased on September 20, 2010, resumed on October 24, 2010, ceased on October 31, 2010, resumed on November 1, 2010, and finally ended on November 13, 2010. (ACBL-5015 Report 2-7). Recovery of the ACBL-5015 barge cost $852,630. (ACBL-5015 Report 7).

As its thirteenth affirmative response in its answer to Paducah Rigging's Amended Thirty-party Complaint, Shandong asserts that "plaintiff and/or third-party plaintiff has failed to mitigate their alleged injuries and/or damages." (Answer on Behalf of Shandong to Def./Third-party Pl. Paducah Rigging 5, DN 34). Additionally, it is a "well-established rule that an injured plaintiff has a duty to mitigate his damages." *Jones v. Consol. Rail Corp.*, 800 F.2d 590, 593 (6th Cir. 1986) (citation omitted). It is then the defendant's burden "to show that the damages were lessened or might have been lessened by the plaintiff." *Id.* (citation omitted) Plaintiffs argue that Paducah Rigging and Shandong cannot prevail on any argument that Plaintiffs did not mitigate their damages as to the recovery of the two barges. (Mem. Brief in Supp. of Pls.' Mot. for Partial

Summ. J. as to Mitigation of Damages 8-9, DN 70-1 [hereinafter Pls.' Mot. for Partial Summ. J.]).

Plaintiffs rely on *Tennessee Valley Sand & Gravel Co. v. M/V DELTA*, 598 F.2d 930 (5th Cir. 1979), and *Malcolm v. Marathon Oil Co.*, 642 F.2d 845 (5th Cir. 1981), in arguing that Paducah Rigging or Shandong must prove the following to prevail on a failure-to-mitigate claim:

> 1) that Surveyor Carrier/ACL's decision to hire Okie Moore on a daily rate to salvage the two barges using conventional A-frame lifting rigs was, giving a wide latitude of discretion to the decision, "unreasonable" and 2) that ACL's decision aggravated its loss, i.e. that defendants had confirmed that an alternative salvor/salvage method/salvage contract was available at a confirmed lower cost.

(Pls.' Mot. for Partial Summ. J. 5-6). Plaintiffs focus primarily on the specifics of the second requirement: that Paducah Rigging and Shandong confirmed that an alternative salvor/salvage method/salvage contract was available at a confirmed lower cost. (*See* Pls.' Mot. for Partial Summ. J. 8-9).

Paducah Rigging responds a mitigation-of-damages argument may not be appropriately disposed of at the summary judgment stage; it is necessarily a matter for trial. (Paducah Rigging's Mem. in Supp. or its Resp. to Pls.' Mot. for Partial Summ. J. as to Mitigation of Damages 4-5, DN 83-1 [hereinafter Paducah Rigging's Resp.]). Paducah Rigging next argues that, while it agrees that it must show that Plaintiffs' conduct had the consequence of aggravating the harm, *Malcom* does not support Plaintiffs' contention that Paducah Rigging or Shandong must confirm that an alternative was available at a confirmed lower cost. (Paducah Rigging's Resp. 6-8). Paducah Rigging also cites *Mecom v. Levingston Shipbuilding Co.*, 622 F.2d 1209 (5th Cir. 1980), to support its contention that Plaintiffs acted unreasonably and failed to mitigate their damages. (Paducah Rigging's Resp. 8-9). Shandong makes essentially the same arguments

in its response.[2] (*See* Shandong's Resp. to Pls.' Mot. for Partial Summ. J. as to Mitigation of Damages, DN 92).

The Court need not consider the second prong of Paducah Rigging and Shandong's burden, as there is a genuine issue of material fact as to the first. Carrier explained in his deposition that there are three salvage rigs on the river system, and of those three, Okie Moore is the only one based in St. Louis and "he was ready to go to work immediately if necessary." (Carrier Dep. 57:5-8, 58:1-6). When questioned as to why the two barges were not recovered at the same time, Carrier expressed concern that if they had done both at the same time, the necessary river restriction would have created "a very dangerous situation." (Carrier Dep. 57:2-23). He also explained why he did not solicit bids:

> [T]hey all have published rates. They don't have – we don't – you know, everything works on a daily basis. We didn't solicit bids on no-cure/no-pay or a bid just to raise the barge. Number one, the salvage jobs that these two were, we would never get – if we'd asked for a bid price for the whole deal, it would have been probably twice of what we spent, because they'd have to figure the worst case scenario . . . .
>
> [F]rom my experience in dealing with this for 45 years, if we'd have asked for a no-cure/no-pay, the low bid could have been $2 million. We would have never got that barge, the 5015, out of there for the money that we spent.

(Carrier Dep. 58:8-16, 59:10-15).

D. J. Smith ("Smith") of Port City Maine Services is Paducah Rigging's expert witness on the issue of damages. (Smith Dep. 5:1-6:13, Oct. 21, 2014, DN 83-3). Upon review of the invoices and reports regarding the salvage of the two barges, Smith opined: (1) "that the invoices submitted by Okie Moore Diving and Salvage appear somewhat inflated and not fair or reasonable"; (2) that the daily rates of $20,000 per day (for SER-302) and $25,000 per day (for

---

[2] Because Shandong makes no novel argument in its response and its arguments do not deviate substantially from Paducah Rigging's, the Court will discuss solely Paducah Rigging's motion. The analysis undertaken by the Court, however, applies to both responses.

7

ACBL-5015) were "somewhat high"; (3) that the recovery and salvage job for the two barges should have been "put out for competitive bids"; and (4) that a written contract should have been executed in order to place conditions and limitations of the salvor. (Port City Marine Services, Inc. Report of Survey PCMS#: 21014EWA at 3-4, DN 70-5).

Shandong's identified expert on damages is marine surveyor Ian Cairns ("Cairns"). (Pls.' Mot. for Partial Summ. J. 7). Cairns opined that: (1) there should have been a written contract executed to lay out the parameters for the contractor; (2) Carrier should have secured a no-cure/no-pay or other form of contract for the work rather than a daily rate contract; (3) both barges could have been recovered at the same time; and (4) failing being done at the same time, the ACBL-5015 should have been addressed first (Cairns Dep. 48:3-16, 49:24-50:6, 56:23-3, 72:18-7, Jan. 21, 2015, DN 83-4).

There has been no argument that any of the damage opinions given by any of these experts does not pass muster under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 590 U.S. 579 (1993). Absent some other evidence, a summary judgment decision on the issue of mitigation of damages, specifically whether or not ACL acted unreasonably in hiring Okie Moore, would rest on credibility determinations as to these three experts. The Sixth Circuit has plainly stated that "[c]ourts may not resolve credibility disputes on summary judgment." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013) (citing *Anderson*, 477 U.S. at 255). The Court must, therefore, deny Plaintiffs' motion.

### B. Paducah Rigging

In its motion for summary judgment, Paducah Rigging argues that: (1) Plaintiffs have not identified a provable defect; (2) Plaintiffs have no reliable expert testimony; (3) Plaintiffs cannot

prove a manufacturing defect; and (4) Plaintiffs' circumstantial evidence is insufficient as a matter of law. (Paducah Rigging's Mot. for Summ. J. 8-17).

"Total failure to show that the defect caused or contributed to the accident will foreclose as a matter of law a finding of strict products liability." *Stark v. Armstrong World Indus., Inc.*, 21 F. App'x 371, 376 (6th Cir. 2001) (citation omitted). Paducah Rigging argues that instead of proving *a* defect, the Plaintiffs have offered *multiple possible* defects, which is insufficient. (Paducah Rigging's Mot. for Summ. J. 8 (citing *Gray v. Gen. Motors Corp.*, 133 F. Supp. 2d 530, 534 (E.D. Ky. 2001))). It points specifically to the testimony of Plaintiffs' metallurgic expert, James Briem ("Briem"), for support. (Paducah Rigging's Mot. for Summ. J. 9). Paducah Rigging argues that because Briem's original opinion postulated a number of potential defects and that his supplemental opinion is not credible, Plaintiffs "cannot meet their burden of identifying a provable defect." (Paducah Rigging's Mot. for Summ. J. 9).

Briem retracted his first opinion to the extent that he offered the possibilities that the sleeve lacked ductility and strength. (Briem Dep. 120:1-121:4, Feb. 13, 2015, Feb. 13, 2015, DN 71-8 [hereinafter Briem Dep. II]). He also retracted his more specific opinions that the lack of ductility and strength could be due to an improper alloy, improper heat treatment on the sleeve, or cold work. (Briem Dep. II 123:24-125:23). To the extent that Paducah Rigging argues that Plaintiffs are still advancing these potential defects, that argument fails. As for Paducah Rigging's argument that Briem's revised theory including the phenomenon of "kissing bonds" is not credible, the Court has already rejected that argument in denying the parties' motions to exclude expert witnesses' testimony, which has been entered contemporaneously with this Memorandum Opinion and Order. As with Plaintiffs' motion, to grant Paducah Rigging's motion on this ground would require, due to the presence of dueling experts, an impermissible credibility

determination at the summary judgment stage on the part of the Court. Accordingly, this argument fails.

Paducah Rigging next argues that Plaintiffs have no reliable expert testimony. (Paducah Rigging's Mot. for Summ. J. 10-11). The Court rejects this argument for the reasons detailed in its Memorandum Opinion and Order denying the parties' motions to exclude expert witnesses' testimony.

Paducah Rigging further argues that Plaintiffs cannot prove a manufacturing defect because Briem's opinions should be adjudicated inadmissible, leaving Plaintiffs with no expert evidence of a defect. (Paducah Rigging's Mot. for Summ. J. 11). It also argues that Plaintiffs cannot prove the sleeve "was manufactured in a manner that departed from its intended design, or that it was not manufactured in accordance with the manufacturer's specifications." (Paducah Rigging's Mot. for Summ. J. 11-12). As for the first part of this argument, the Court has rejected it in its Memorandum Opinion and Order denying the parties' motions to exclude expert witnesses' testimony.

Paducah Rigging correctly identifies the Restatement (Third) of Torts: Products Liability ("the Restatement") as providing the law of strict products liability in admiralty cases in the Sixth Circuit. (Paducah Rigging's Mot. for Summ. J. 8 (citing *Stark*, 21 F. App'x at 375; *Briley v. U.S. United Barge Line, LLC*, No. 5:10-CV-00046-R, 2012 WL 2344460 (W.D. Ky. June 20, 2012))). Comment c to section 2 of the Restatement provides, *inter alia*, that "[c]ommon examples of manufacturing defects are products that are physically flawed, damaged, or incorrectly assembled." Restatement (Third) of Torts: Products Liability § 2 cmt. c. Plaintiffs are unequivocally asserting that the sleeve was physically flawed in that at least one seam in the sleeve was improperly bonded. (Pls.' Resp. to Def. Paducah Rigging's Mot. for Summ. J. 15).

10

Plaintiffs have successfully alleged a defect in the form of a physical flaw; they need not know the intended design or manufacturer's specifications to successfully assert a defect. Paducah Rigging's argument on this point fails.

Finally, Paducah Rigging argues that Plaintiffs' circumstantial evidence is insufficient as a matter of law. (Paducah Rigging's Mot. for Summ. J. 13-17). Paducah Rigging cites out-of-circuit case law in support of the proposition that circumstantial evidence alone is not sufficient in the context of products liability. (Paducah Rigging's Mot. for Summ. J. 13-15). Understandably, Paducah Rigging also attempts to distinguish *Briley* from the case at bar. (Paducah Rigging's Mot. for Summ. J. 15-16).

*Briley* is, however, dispositive. In that case, this Court found that a metallurgist's testimony that, based on examination of the faulty piece of equipment and an exemplar, the equipment was defective "provide[d] *direct* evidence of the manufacturing defect, which overrides any argument . . . for summary judgment." *Briley*, 2012 WL 2344460, at *13 (emphasis added). "In any event, circumstantial evidence plays an important role to establish manufacturing defect claims . . . ." *Id.* (citations omitted). Briem's expert testimony, coupled with the circumstantial evidence that several experienced seamen testified that they had never seen a sleeve split in this manner before, is sufficient.

In order to overcome *Briley*, Paducah Rigging argues that there is no reliable expert metallurgic evidence to support Plaintiffs' claim of a manufacturing defect. (Paducah Rigging's Mot. for Summ. J. 16). As noted above, however, the Court has already determined that Briem's opinion based on the theory of an improperly welded seam is admissible. Accordingly, this argument is rejected.

In sum, Paducah Rigging's arguments do not survive the Rule 56 summary judgment standard. Accordingly, its motion must be denied.

### C. <u>Shandong</u>

In its motion for summary judgment, Shandong argues that: (1) it should be dismissed because it did not sell the sleeve; (2) it should be dismissed because the product did not reach ACL in the condition in which it was sold; (3) Plaintiffs have not shown sufficient proof as to the intended design of the sleeve, and thus cannot assert that the sleeve deviates from its intended design; (4) Plaintiffs do not know how the sleeve was manufactured, and so cannot assert how the manufacturing process failed; (5) Plaintiffs cannot rely on circumstantial evidence to prove a manufacturing defect; and (6) the proximate cause of the incident was an undersized face wire and insufficient rigging. (Shandong's Mem. in Supp. of Mot. for Summ. J., DN 73-1 [hereinafter Shandong's Mot. for Summ. J.]).

Arguments (3), (4), and (5) have been analyzed above in the context of Paducah Rigging's motion for summary judgment. The Court will not duplicate that analysis as to this motion. The result is the same: these arguments fail.

#### 1. *Whether Shandong Sold the Sleeve*

Section 1 of the Restatement (Third) of Torts: Products Liability notes that "[o]ne engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect." Restatement (Third) of Torts: Products Liability § 1. Shandong argues that it was incorrectly listed as the importer of the sleeve on the bill of lading. (Shandong's Mot. for Summ. J. 6). It also argues that the sleeve was shipped directly from the manufacturer, SMC, and thus Shandong was not in the distribution chain at all. (Shandong's Mot. for Summ. J. 6).

Setting aside that there is a genuine issue of material fact regarding whether Shandong was listed incorrectly on the bill of lading,[3] even if SMC was the importer, the Court could pierce the corporate veil and hold Shandong liable. *See Mo. Portland Cement Co. v. Walker Barge Fleeting Serv., Inc.*, 561 F. Supp. 12, 15 (W.D. Ky. 1982).

"At its core, the question of whether to pierce the corporate veil is a fact-intensive inquiry, because 'the circumstances necessarily vary according to the circumstances of each case . . . .'" *Vitol, S.A. v. Primerose Shipping Co. Ltd.*, 708 F.3d 527, 544 (4th Cir. 2013) (quoting *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 684 (4th Cir. 1976)). There are several factors that courts may consider in determining whether to pierce the corporate veil:

> "gross undercapitalization[;] insolvency[;] siphoning of funds[;] failure to observe corporate formalities and maintain proper corporate records[;] non-functioning of officers[;] control by a dominant stockholder[;] [] injustice or fundamental unfairness[;]" . . . intermingling of funds; overlap in ownership, officers, directors, and other personnel; common office space; the degrees of discretion shown by the allegedly dominated corporation; and whether the dealing of the entities are at arm's length.

*Id.* (citations omitted)). The Court will address only those factors relevant to and in evidence in the case at bar.

Jiao is the sole owner of both Shandong and SMC. (Jiao Dep. 5:23-25, 16:6-11, 29:20-23). Shandong and SMC have the same address. (Jiao Dep. 15:13-16). Jiao receives his paycheck from Shandong. (Jiao Dep. 15:23-24, 16:3-5). Shandong has four employees; SMC has no payroll. (Jiao Dep. 15:22-23, 37:11-20). Shandong has liability insurance; SMC does not. (Jiao

---

[3] Shandong is clearly listed on the bill of lading. (Bills of Lading, DN 79-2). Lawrence Jiao ("Jiao") is the sole owner of both Shandong and SMC, and he does not recall whether Shandong or SMC acted as the importer for the sleeve. (Jiao Dep. 29:20-30:2, 44:11-45:17, July 17, 2014, DN 72-2). William Edwards ("Edwards"), owner of Paducah Rigging, states that it is "very unlikely" that a mistake was made on the bill of lading. (Edwards Deposition 154:14-21, Jan. 15, 2014, DN 72-3).

13

Dep. 77:3-15). Both Shandong and SMC are involved in international trade, and Paducah Rigging is one of only two customers of SMC. (Jiao Dep. 38:3-22). To Jiao's knowledge, Paducah Rigging pays only SMC, not Shandong. (Jiao Dep. 104:2-6). SMC retains that money, and if there was profit at the end of the year, Jiao paid it to himself. (Jiao Dep. 103:15-18, 104:7-9). Both companies provide rigging. (Jiao Dep. 38:25-39:3). Jiao expressed that he may use the companies interchangeably. (Jiao Dep. 45:5-17, 56:11-17).

In sum, Shandong and SMC have the same owner, the same sole officer, and the same address. Shandong has both employees and insurance; SMC has neither. SMC has two customers, one of which is Paducah Rigging. Jiao draws his pay from Shandong and collects any profit from SMC at the end of the year. Jiao himself has some difficulty keeping these companies distinct in his mind. These facts are sufficient to find that Shandong and SMC are each other's alter egos; it could be concluded that they are effectively one and the same corporation. *See Road Sprinkler Fitters Local Union No. 669 v. Dorn Sprinkler Co.*, 669 F.3d 790, 794 (6th Cir. 2012) ("Where two companies are engaged in the same business in the same marketplace, courts ask "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision and ownership" to decide whether one is the alter ego of the other." (citation omitted)).

Jiao's deposition is rife with references to the orders he has fulfilled for Paducah Rigging for aluminum sleeves, and Shandong is listed on the bill of lading. Jiao owns no companies other than Shandong and SMC. (Jiao Dep. 30:3-4). Therefore, one or the other company sold the sleeve, and given that the two companies could be each other's alter egos, at trial it may be immaterial which company is listed on the bill of lading.

In short, either Shandong or SMC imported the sleeve for Paducah Rigging, and because they may be considered each other's alter egos, neither may be dismissed. Accordingly, Shandong's argument for summary dismissal is denied.

2.  *Alteration of the Sleeve by Paducah Rigging*

Shandong next argues that because ACL did not receive the sleeve in the condition it was sold, Plaintiffs have no claim against Shandong. (Shandong's Mot. for Summ. J. 6). Namely, the sleeve was manufactured in an oval shape, but Paducah Rigging swaged the sleeve around the face wire, changing its shape. (Shandong's Mot. for Summ. J. 6).

Comment b to section 15 of the Restatement (Third) of Torts: Products Liability states:

> When the plaintiff establishes product defect under the rules stated in Chapter 1, a question can arise whether the misuse, alteration, or modification of the product by the user or a third party contributed to the plaintiff's harm in such a way as to absolve the defendant from liability, in whole or in part. Such a question is to be resolved under the prevailing rules and principles governing causation or the prevailing rules and principles governing comparative responsibility, as the case may be.

Restatement (Third) of Torts: Products Liability § 5 cmt. b. Such a prevailing rule is that "injuries suffered by [the plaintiff] must be the proximate result of a defect which existed in the product at the time it was sold, and if the product has been materially altered or modified by a third party after the sale, those injuries cannot be traced to [the defendant] . . . ." *Lamb v. Shepard v. Sears, Roebuck & Co.*, 1 F.3d 1184, 1188 (11th Cir. 1993) (citation omitted). When such changes are not substantial or the product is expected to undergo alteration for its ultimate use, however, the injuries can be traced to the manufacturer and others in the chain of distribution. *See Franks v. Nat'l Dairy Prods. Corp.*, 282 F. Supp. 528, 532 (W.D. Tex. 1968).

Jiao testified that he was aware that end users of the sleeves "squeeze [the sleeve] or maybe they use other fittings to go together with the wide rope." (Jiao Dep. 80:18-22). Shandong

15

began its relationship with Paducah Rigging when Edwards provided Jiao with an exemplar sleeve. (Jiao Dep. 35:18-23). Edwards confirmed that Paducah Rigging "ordered sleeves based on existing sleeves that [it] had made" from Jiao, (Edwards Dep. 52:16-17, 58:5-16). Prior to that time, Paducah Rigging made its own sleeves. (Edwards Dep. 53:5-22). This testimony makes clear that the sleeve was intended, as was the example upon which it was based, to be swaged onto a wire. Thus, the alteration to the sleeve in question that occurred by swaging was an expected alteration, with the result that Shandong may still be liable for any defect in the sleeve. Shandong's argument to the contrary fails.

### 3. *Undersized Face Wire*

Shandong's final argument is that the proximate cause of the incident was an undersized face wire and insufficient rigging. (Shandong's Mot. for Summ. J. 11-12). Shandong's navigational expert, William Beacom opined that the rigging was insufficient on the day of the incident. (Beacom Dep. 79:25-80:3, DN 90-4). Beacom thinks, however, that having a one-and-one-eighth inch wire would have made no difference compared to the one inch wire that was used. (Beacom Dep. 113:23-114:5). Another of Shandong's experts, Cairns, agrees on both points. (Cairns Dep. 118:10-15, 178:23-179:2).

Paducah Rigging's expert John Sutton believes that additional rigging was needed and that a one-and-one-eighth inch face wire, rather than a one-inch face wire, was the appropriate size. (Sutton Dep. 69:10-25, 92:9-12, 95:15-19, Oct. 30, 2014, DN 89-10). Plaintiffs' expert Larry Means disagrees, testifying that a one-inch wire was sufficient. (Means Dep. 81:11-82:3, Sept. 12, 2014, DN 71-11). Plaintiffs' expert James Briem also testified that the one-inch wire did not contribute to the incident. (Briem Dep. 98:15-23, Sept. 12, 2014, DN 71-7). Captain Ford testified that he believed the rigging was sufficient, and that he would add additional rigging in

16

different conditions. (Ford Dep. 52:15-25). Pilot Layton also testified that additional rigging was not necessary. (Layton Dep. 163:18-164:11).

In short, opinions differ regarding the sufficiency of the rigging. These create a genuine issue of material fact regarding whether additional or different rigging would have averted the incident which must be resolved at trial. Accordingly, summary judgment is in appropriate.

Shandong has not prevailed on any of its arguments. The Court will therefore deny its motion.

### D. SMC

SMC's motion for summary judgment simply adopts Shandong and Paducah Rigging's motions, and admits that its name should have appeared on the bill of lading. (SMC's Mot. for Summ. J. 2). For the reasons detailed above as to Shandong's motion and Paducah Rigging's motion, SMC's motion must also be denied.

### V. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Partial Summary Judgment as to Mitigation of Damages (DN 70); Shandong's Motion for Summary Judgment (DN 73); Paducah Rigging's Motion for Summary Judgment (DN 74); and SMC's Motion for Summary Judgment (DN 75) are **DENIED**.

**Greg N. Stivers, Judge**
**United States District Court**
November 10, 2015

cc: counsel of record